Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| VANESSA SIMMONDS, | NO. 2:12-cv-01937 JLR |
| Plaintiff, | |
| and | DECLARATION OF DAVID M. SIMMONDS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| GEEKNET, INC. (f/k/a VA LINUX SYSTEMS, INC.), a Delaware corporation, | |
| Nominal Plaintiff | |
| v. | |
| CREDIT SUISSE SECURITIES (USA) LLC, a Delaware limited liability company, | |
| Defendant | |

David M. Simmonds declares as follows:

1. <u>Identity and Competency</u>.  I am an attorney with the law firm of Gordon Tilden Thomas & Cordell, LLP.  Along with the Keller Rohrback law firm, we represent plaintiff Vanessa Simmonds.  I have personal knowledge of the facts set forth below and am competent to testify.

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 1
No. 2:12-cv-01937 JLR

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

2. <u>Role in Investigation</u>.  I have been involved in every aspect of this case and the prior Section 16(b) cases filed in this Court in 2007, including the investigation of underlying facts in particular.  I have studied the financial markets since the early 1980s and have learned many valuable—albeit, some very difficult—lessons along the way.  One of these lessons is that coming to the realization there may have been wrongdoing, undertaking an investigation, and then piecing together seemingly unrelated facts in a way that begins to expose the wrongdoing is a very long and tedious process, if you are lucky.  For this reason, wrongdoing in the financial markets generally goes undetected and unchecked regardless of even extraordinary diligence.  If this is lesson 1(a), then lesson 1(b) has to be that once the wrongdoing has been exposed, it becomes very easy for others to make the alleged wrongdoing appear—in retrospect—to have been obvious to anyone with a minimal IQ not living in a cave.  This luxury of hindsight in connection with securities-related wrongdoing is precisely the point <u>Credit Suisse</u> tried to make in Congressional hearings in 2002 investigating the fact that Credit Suisse "maintained a 'strong buy' on Enron until Nov. 29, just days before the company filed for federal bankruptcy protection, its stock trading at 47 cents a share."  Ben White, Washington Post Staff Writer, *Analysts Face Scrutiny Over Enron Ratings*, (Feb. 27, 2002), available at http://www.investars.com/articles/article20020227.asp.

3. <u>The Geeknet Investigation and Absence of Section 16(a) Reports</u>.  Throughout the course of the prior litigation, we continued to investigate all available sources of information that might shed further light on events that bore some relationship to the claims asserted.  This was a difficult process in light of the fact that no Section 16(a) reports were filed as to relevant

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 2
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

transactions and affiliations.  As a result, we were left with attempting to piece together a jig-saw of circumstantial evidence in our continuing effort to figure out what happened.

4. <u>Value of Continuing Investigation</u>.  Without question, our continuing investigation over the course of the prior litigation enabled us to add data points to our knowledge base.  We had concluded we could properly address the Ninth Circuit decision in *In re Section 16(b) Litigation*, 638 F.3d 1072, 1097 (9th Cir. 2011), on the demand issue—which was based on *In re Kauffman Mut. Fund Actions,* 479 F.2d 257, 267 (1st Cir.1973)—particularly in light of the subsequent decision in *Lucas v. Lewis*, 428 Fed. Appx. 694 (9th Cir. 2011), that explained the scope of dismissal as used in *In re Section 16(b) Litigation.*  Nonetheless, we found nothing in that investigative process suggesting we needed to reconsider the fundamental basis of our existing group allegations—namely, the collaboration between issuer decision-makers and underwriters.

5. <u>Recent Data Points from Emerging Shift in Academic Opinion</u>.[1]  We continued to scour all available sources of information following the United States Supreme Court's 2012 decision overturning *Whittaker v. Whittaker Corp.*, 639 F.2d 516 (9th Cir. 1981), and *Litzler v. CC Investments, L.D.C.*, 362 F.3d 203 (2d Cir. 2004)*,* and establishing an equitable tolling standard for Section 16(b) for the first time in history.  In doing so, we unexpectedly noticed an emerging shift in academic opinions among those who had devoted a considerable portion of their careers to dissecting and analyzing the "who, what, when, where and how" of the 1999-2000-era IPO bubble phenomenon.  These articles presented credible evidence pointing <u>away</u>

---

[1] Like we do, the SEC and financial regulatory authorities look to and rely upon academic research in helping to formulate their conclusions.  *See, e.g.*, Ex. D at 43017 n.309, n.310, n.311, n.314, *id.* at 43018 n.321, n.322, n.323, n.324, and *id.* at 43019 n.330; *see also* NYSE/NASD IPO Advisory Committee Report and Recommendations (May 2003), available link at http://www.finra.org/newsroom/newsreleases/2003/p002905 (looking to academic research as part of SEC-requested recommendations for avoiding re-occurrence of 1999-2000 era IPO bubble).

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 3
No. 2:12-cv-01937 JLR

**GORDON TILDEN THOMAS & CORDELL LLP**
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

from the previously accepted belief of an underpricing collusion between underwriters and executive decision-makers of a particular issuer (the collaborative conduct element of the prior litigation), <u>towards</u> a non-issuer-specific coordination among a select group of high-profile underwriters and prominent venture capital firms (the core allegation of the present case).  *See, e.g.,* Daniel Bradley, Incheol Kim, and Laurie Krigman, "Currying Favor with Top Venture Capital Firms: The Role of IPO Underpricing and All-Star Coverage" (Aug. 24, 2011).  A true and correct copy of this article is attached as **Exhibit A**.  It observes:

> We <u>depart from the literature</u> and explore the notion that investment banks provide all-star coverage to curry favor with <u>venture capitalists rather than issuing firms</u>.

Ex. A at 23 (emphasis supplied).  This shift acknowledged and expanded on a concept first introduced in a paper in 2009 by Gerard Hoberg and H. Nejat Seyhun entitled, "Do Underwriters Collaborate with Venture Capitalists in IPOs? Implications and Evidence," a true and correct copy of which is attached as **Exhibit B**.  The first sentence of this paper reads:

> An area of inquiry that has <u>not</u> received any attention in the IPO literature is the potential collaboration between underwriters and venture capitalists.

Ex. B at 1 (emphasis supplied).  Once we became aware of these and other academic papers—<u>in 2012</u>—the focus of our ongoing investigation likewise began to shift.  The resulting factual finding from this change in investigative focus—which is dramatic and goes directly to the composition of the Section 16(b) group—is one of two critical differences between this Complaint and that filed in 2007.[2]

---

[2] These recent academic papers <u>still</u> did not recognize the pre-lockup-expiration strategies as a core objective of the collaboration between underwriters and VC firms:  "Top VCs tolerate higher levels of underpricing because the

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 4
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

6. <u>Venture Capitalist Involvement</u>. Focusing attention on high-profile underwriters and prominent venture capital ("VC") firms, we began to notice a common denominator among certain of the high-profile underwriters, including Credit Suisse, and certain of the prominent VC firms, including Sequoia Capital, and the bubble-era IPOs with the biggest spread between the IPO price and aftermarket price: the law firm of Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"). We were certainly aware that Wilson Sonsini had represented many bubble-era underwriters and issuers. At the time, however, we were unaware of the collaboration between Wilson Sonsini and particular VC funds. In 2012, we began searching for evidence of such a connection. This search in 2012 led us to the December 2009 articles about the Wilson Sonsini investment funds stemming from the financial disclosures by John Roos in connection with his nomination as U.S. Ambassador to Japan.[3]

---

information momentum generated by underpricing allows them to cash out at higher prices <u>when the lockup expires</u>." Ex. A (emphasis supplied).

[3] Credit Suisse misstates my Rule 41(d) opposition declaration in both its Rule 41(d) reply brief and its motion to dismiss. In my declaration, I stated the following:

> <u>Neither I nor any of my colleagues working on this case was aware, until 2012</u>, of Mr. Roos, his nomination as U.S. Ambassador to Japan, or (most importantly) any connection between an ambassadorial nomination and the subject matter of this case.
> \*   \*   \*
> In the course of our investigation, a common link between the underwriters and venture capital firms involved in those IPOs with the largest spreads between the IPO price and immediate aftermarket price became apparent to us: the law firm of Wilson Sonsini Goodrich & Rosati. In 2012, this led us to information stemming from Mr. Roos' disclosures and investigative articles based thereon, including key information derived from interviews with current and former members of Wilson Sonsini who participated in the 1999-2000-era investment fund.

Dkt. 25 ¶¶ 2, 4 (emphasis supplied). I did <u>not</u> state the proposition upon which Credit Suisse premises its Rule 41(d) reply brief:

> Plaintiff's claim that supposedly new "key evidence" only "surfaced" in a ***December 2009*** blog post (*see id.* at 3; *see also* Simmonds Decl. at 1-2 [Dkt. 25]), Plaintiff offers no explanation as to why she did not file *Geeknet II* until ***November 2012***, almost three years after the December 2009 article, but instead continued to litigate *Geeknet I* until voluntarily dismissing it in ***June 2012***.

DECLARATION OF DAVID SIMMONDS IN OPPOSITION　　**GORDON TILDEN THOMAS & CORDELL LLP**
TO DEFENDANT'S MOTION TO DISMISS – 5　　　　　　1001 Fourth Avenue, Suite 4000
No. 2:12-cv-01937 JLR　　　　　　　　　　　　　　　　　Seattle, WA  98154
　　　　　　　　　　　　　　　　　　　　　　　　　　Phone (206) 467-6477
　　　　　　　　　　　　　　　　　　　　　　　　　　Fax (206) 467-6292

7. <u>The Real Significance of the Roos Disclosures</u>.  To be clear, the real significance to us of the John Roos financial disclosures was that they generated stories about the bubble-era Wilson Sonsini investment funds.  These articles included interviews with Wilson Sonsini bubble-era investment fund participants.  *See also* Simmonds Decl. [Dkt. 25] ¶ 4 ("In 2012, this led us to information stemming from Mr. Roos' disclosures and investigative articles based thereon, including key information derived from interviews with current and former members of Wilson Sonsini who participated in the 1999-2000-era investment fund.").  Ultimately, the important nugget of information we received from the Roos-related articles was that the Wilson Sonsini funds' interests were aligned more with VC firms than with its issuer clients, and that "shares are typically distributed as soon as they can be.  Partners can then hold or sell." *Id.*, Ex. A.  This created a mechanism through which Wilson Sonsini could effectively evade the lockup restrictions while maintaining the appearance that the terms of the lockup had been complied with.  Read in conjunction with our other newly discovered data points, we interpret this information as follows:  Partners can then use the shares they knew they would receive upon prompt distributions to cover the collars they placed to lock in profits when the stock was trading during the lock-up (in the case of VA Linux/Geeknet) in the $200-$300 range instead of (again in the case of VA Linux/Geeknet) in the $30s upon expiration of the lock-up.  **Exhibit C** is a true and correct copy of an article, entitled "Cashing Out," from DerivativesStrategy.com (Sept.

---

Dkt. 27 at 4 (emphasis in original).  Credit Suisse makes the same mischaracterization in its motion to dismiss:
> Plaintiff's reliance on the December 2009 blog post, Elinson article, and Roos disclosure forms in her Rule 41(d) opposition is an admission that she was on notice of her cause of action, including as to her "new" "facts" concerning Wilson Sonsini and Sequoia, no later than December 2009, which was more than three years before she filed *Geeknet II* (thus more than a year outside the limitations period).

Dkt. 31 at 25.

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 6
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

2000), by Nina Mehta.  As noted therein by Credit Suisse equity derivatives product manager Keith Styrcula (covering the time of the VA Linux IPO):

> Over the last year, securities lawyers representing the holders of restricted stock have tried to find more creative end-runs around the standard language of lock-up agreements.

Ex. C at 3.

8. European "Zero-Cost" Collars.  In a July 22, 2010 Proposed Rule (a true and correct copy of which is attached as **Exhibit D**), the SEC defines a collar as a combination of two options in which an investor sells a call option at one strike price and buys a put option at a lower strike price, "thereby limit[ing] the potential for appreciation or depreciation to the range—the "collar"—defined by the two strike prices." Ex. D at 43018 n.321.  If, for example, a stock is trading at 10x, the call option permits a third party to buy the stock at 11x and the put permits the owner to sell to a third party at 9x.  Among the typical characteristics of a "European collar" are that the counter-party to the two legs of the collar is an investment banks, and the collar is "zero cost"—the premium the person or entity placing the collar pays for buying the "put" leg of the collar is exactly offset by the premium he/it receives for selling the "call" leg of the collar:

> To lock in profits on his Symbol stock, Razmilovic entered into so-called European "zero cost collar" transactions with a brokerage firm, an option strategy designed to protect against a decline in the stock price.  Razmilovic "collared" thousands of Symbol shares that he owned by selling a call option and buying a put option, thereby establishing a minimum and maximum price range for the stock.

Compl. ¶ 155(a), *SEC v. Symbol Techs.,* www.sec.gov/litigation/complaints/comp18734.pdf.

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 7
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

9. <u>Foundational Understanding that Share Ownership Includes Economic Interest: What Geeknet's SEC Filings Appear to Show</u>.  Credit Suisse and its lawyers state the following in the present motion to dismiss:

> And even more telling, publicly available SEC filings—<u>which Plaintiff does not appear to have uncovered in the course of her "investigation"</u>—disclosed shareholdings in VA Linux [Geeknet] stock following the IPO, and show that Sequoia and Wilson Sonsini held their shares into June 2000, when the six-month lock-up period expired.

Mot. [Dkt. 31] at 23 (emphasis added).  With the exception of the underlined portion of the sentence, we agreed with Credit Suisse in substance—that is, up until mid-2012.  We "uncovered" the SEC filings years ago.  But we recently "uncovered" <u>additional</u> information that the referenced SEC filings—and therefore the statement quoted above—are inaccurate, except in perhaps a hyper-technical sense, due to the impact of "decoupling" on the "foundational understanding" of reported stock ownership (discussed below).  This raises the issue whether our burden to show due diligence can possibly require us to unearth evidence prior to 2010—and understand its relevance to Section 16—when Credit Suisse and its lawyers have yet to do so <u>even in 2013</u>.

10. <u>July 22, 2010 SEC Proposed Rule</u>.  The SEC took aim at "Empty Voting" and "Decoupling" issues in the July 22, 2010 Proposed Rule referred to above (¶ 8).  According to the SEC, reported stock ownership creates a "foundational understanding" that the "shareholder" who uses that status to vote his shares also possesses an economic interest in the company.  (This is what we all commonly believe regarding what it means to own a share of stock.)  The SEC expresses serious concern over the practice of "decoupling" in which some sophisticated shareholders with an agenda use hedging techniques such as "collars … [to] retain full voting

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 8
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

rights despite having hedged a portion of their economic interest." Ex. D at 43018.  The SEC describes this technique as "empty voting."  *Id.* at 43017.  Because empty voting lacks transparency, "'decoupling' challenges this foundational understanding" that stock ownership inherently includes both benefits and risks for all shareholders alike.  *Id*.  The SEC specifically identifies "collars" as a primary device used to decouple economic interest from reported share ownership, *id.* at 43018, and then proceeds to discuss "Potential Regulatory Responses," the first of which is as follows:  "As one possible response to empty voting and related phenomena, the Commission could consider requiring disclosure that creates transparency."  *Id.* at 43017-19.  Simply put, the above-quoted statement made by Credit Suisse and its lawyers in the motion to dismiss fails to account for the impact of "decoupling" on the "foundational understanding" of reported stock ownership.  We did not see this Proposed Rule on July 22, 2010, and we would not have understood its significance to this case even if we had.

11. <u>Impact of Collars on Reported Stock Ownership</u>.  A true and correct copy of a draft May 2011 academic paper entitled "*Why Do Insiders Hedge Their Ownership? An Empirical Examination*" is attached hereto as **Exhibit E**.  As the paper points out, collars and other hedging devices "do <u>not</u> affect managerial ownership reported in the proxy statement which also contributes to the lack of transparency of these securities."  Ex. E at 16 (emphasis supplied).  Thus, while the publicly available SEC filings referred to by Credit Suisse and its attorneys ostensibly show share ownership and direct sales and distributions, they offer <u>no</u> insight into the use by either Sequoia Capital or Wilson Sonsini, directly, or by their distributees,

| DECLARATION OF DAVID SIMMONDS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS – 9<br>No. 2:12-cv-01937 JLR | GORDON TILDEN THOMAS & CORDELL LLP<br>1001 Fourth Avenue, Suite 4000<br>Seattle, WA  98154<br>Phone (206) 467-6477<br>Fax (206) 467-6292 |
|---|---|

indirectly, "of 'collars' and other hedging devices that, in effect, evaded restrictions on sales, regulatory reporting requirements, and shareholder detection."[4]  Compl. [Dkt. 1] ¶ 4.7.

12. <u>Knowledge of European Collars is Uncommon.</u>  Even after discovering facts that caused us to refocus our investigation on the relationship between the underwriters and VC firms (as opposed to the issuer decision-makers as in the prior case), I never would have recognized Credit Suisse's, Sequoia Capital's, and Wilson Sonsini's utilization of collars and other similar devices to evade the lock-up restrictions without shareholder or regulatory detection except that I happened to have some exposure to European collars from working on a previous case.  (Even then, collars were used in a different manner and for a different purpose.)  I do not believe the typical shareholder has ever heard of collars, European or otherwise.

13. <u>This Declaration Merely Provides an Overview of the Investigation on Which the Complaint Is Based</u>.  This declaration presents an overview of how the investigation we conducted prior to filing this lawsuit came about, describes some of the key components of the new information the investigation revealed (all within the last two years), and explains how that new information resulted in a fundamentally different group involved in fundamentally different conduct than in the previous action.  This declaration is necessarily abbreviated as a practical matter.  There is additional circumstantial support for the allegations in the Complaint.  Also missing is a discussion of my review of non-VA Linux/Geeknet company filings, share ownership records, and other material relating to the involvement of the small group of

---

[4] Collars and other concealed hedging devices alleged by Plaintiff in this litigation (but not in the prior litigation) are substantively different than "early releases" as used by Credit Suisse in its motion as evidence of the sameness of the two cases.  Mot. [Dkt. 31] at 28.  The latter is reported and therefore transparent to shareholders.  The former is not.  The orchestrated conduct of Credit Suisse, Sequoia Capital and other group members to use these devices as part of a pre-lockup-expiration exit strategy free of shareholder detection is the second major difference between the present Complaint and the 2007 Complaint.

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 10
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

underwriters, VC firms, and law firms that were involved in an inordinate number of the most notorious of the bubble-era IPOs, which effort proved to be invaluable in deciphering the common and predictable business methods of the group members. Nor does this declaration detail the countless hours spent pursuing what turned out to be valueless dead-ends—although that unquestionably has been a part of this process as well.

14. <u>The 2012 Complaint Is Not a Cosmetic Rejiggering of the 2007 Complaint</u>. We do not dispute that as part of our investigation we learned of some facts that were available somewhere in the public domain not only prior to 2010, but even pre-dating the 1999-2000-era IPO bubble. However, we collected, analyzed, and assembled those facts in an original manner in 2012, prompted by the heavily data-supported recent shift in academic focus to an underwriter-VC collaboration (which was, we believe, previously unknown).[5] This is what formed the allegations set forth in the Complaint and is why we believe this case is not only timely but fundamentally distinct from the prior litigation. There is not "rejiggering"—"cosmetic" or otherwise. We abandoned our fundamental allegations relating to issuer-underwriter underpricing—a central component of the group/insider status allegations in the previous litigation—based on objectively supportable reasons. Our findings led to the allegations set forth in the Complaint that remove insider officers and executives as the driving-force members of the group, and instead focus on Credit Suisse's collaboration with VCs.

15. <u>Authentication of Demand Package Issued to Geeknet Board</u>. Credit Suisse's motion to dismiss argues that Plaintiff's pre-suit demand is inadequate but does not provide the

---

[5] *See also* 17 U.S.C. § 101 (defining "compilation" for purposes of U.S. copyright law as "a work formed by the collection and assembling of <u>preexisting</u> materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship") (emphasis supplied).

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 11
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

Court with a copy of the demand.  Accordingly, attached hereto as **<u>Exhibit F</u>** is a true and correct copy of Plaintiff's demand (a demand letter with a draft of our complaint).  The demand was issued to the board members of Geeknet on August 29, 2012.  Ex. F at 1.  Contrary to what Credit Suisse says in its motion, our demand explicitly sets forth specific requested remedial action:

> we request that Geeknet bring suit against Credit Suisse Securities (USA) LLC within 60 days to prosecute the claim described in the enclosed draft complaint.

*Id.*

**I declare under penalty of perjury that the foregoing is true and correct**.

Executed this 19th day of February, 2013, at Seattle, Washington.

                                        *s/David M. Simmonds*
                                  David M. Simmonds, WSBA #6994

DECLARATION OF DAVID SIMMONDS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS – 12
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following.

**Counsel for Nominal Plaintiff Geeknet, Inc.**:
Molly M. Dailey
Stoel Rives
600 University Street, Suite 3600
Seattle, WA 98101
T: (206) 624-0900
F: (206) 386-7500
Email: mmdaily@stoel.com

**Counsel for Credit Suisse Securities (USA) LLC**:
Christopher B. Wells
Lane Powell PC
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101
T: 206-223-7000
F: 206-226-7107
Email: wellsc@lanepowell.com

Davis S. Lesser
Fraser Hunter
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-230-8851
212-230-8888
David.lesser@willmerhale.com
Fraser.hunter@willmerhale.com

*s/Mark Wilner*
Mark Wilner, WSBA #31550
Gordon Tilden Thomas & Cordell LLP

DECLARATION OF DAVID SIMMONDS IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS – 13
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292