Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| VANESSA SIMMONDS,<br><br>    Plaintiff,<br><br>and<br><br>GEEKNET, INC. (f/k/a VA LINUX SYSTEMS, INC.), a Delaware corporation,<br><br>    Nominal Plaintiff<br><br>    v.<br><br>CREDIT SUISSE SECURITIES (USA) LLC, a Delaware limited liability company,<br><br>    Defendant | NO. 2:12-cv-01937 JLR<br><br>PLAINTIFF VANESSA SIMMONDS' NOTICE OF SUPPLEMENTAL AUTHORITY |

Pursuant to Local Civil Rule 7(n), plaintiff attaches an article by Joseph Nocera from the Sunday, March 10, 2013, edition of the *New York Times*, along with certain documents accompanying the article from the *New York Times* website. We

PLAINTIFF VANESSA SIMMONDS' NOTICE OF
SUPPLEMENTAL AUTHORITY – 1
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

note:  (a) the yellow highlighting is by the *New York Times* and not ourselves; and

(b) we have only attached a small portion of the documents posted on the website.

DATED this 20th day of March, 2013.

| | |
|---|---|
| **GORDON TILDEN THOMAS & CORDELL LLP**<br>Attorneys for Plaintiff | **KELLER ROHRBACK L.L.P.**<br>Attorneys for Plaintiff |
| By: *s/Mark Wilner*<br>   Jeffrey I. Tilden, WSBA #12219<br>   Mark A. Wilner, WSBA #31550<br>   David M. Simmonds, WSBA #6994<br>   1001 Fourth Avenue, Suite 4000<br>   Seattle, Washington 98154<br>   Telephone: (206) 467-6477<br>   Facsimile: (206) 467-6292<br>   Email: jtilden@gordontilden.com<br>   Email: mwilner@gordontilden.com<br>   Email: dsimmonds@gordontilden.com | By: *s/Ian Birk*<br>   William C. Smart, WSBA #8192<br>   Ian S. Birk, WSBA #16296<br>   1201 Third Avenue, Suite 3200<br>   Seattle, Washington 98101<br>   Telephone: (206) 623-1900<br>   Facsimile: (206) 623-3384<br>   Email: wsmart@kellerrohrback.com<br>   Email: ibirk@kellerrohrback.com |

PLAINTIFF VANESSA SIMMONDS' NOTICE OF SUPPLEMENTAL AUTHORITY – 2
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

# CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following.

**Counsel for Nominal Plaintiff Geeknet, Inc.:**
Molly M. Dailey
Stoel Rives
600 University Street, Suite 3600
Seattle, WA 98101
T: (206) 624-0900
F: (206) 386-7500
Email: mmdaily@stoel.com

**Counsel for Credit Suisse Securities (USA) LLC:**
Christopher B. Wells
Lane Powell PC
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101
T: 206-223-7000
F: 206-226-7107
Email: wellsc@lanepowell.com

Davis S. Lesser
Fraser Hunter
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-230-8851
212-230-8888
David.lesser@willmerhale.com
Fraser.hunter@willmerhale.com

*s/Mark Wilner*
Mark Wilner, WSBA #31550
Gordon Tilden Thomas & Cordell LLP

---

PLAINTIFF VANESSA SIMMONDS' NOTICE OF
SUPPLEMENTAL AUTHORITY – 3
No. 2:12-cv-01937 JLR

GORDON TILDEN THOMAS & CORDELL LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

**The New York Times**

March 9, 2013

# Rigging the I.P.O. Game

By JOE NOCERA

ONCE upon a time, in a very different age, an Internet start-up called eToys went public. The date was May 20, 1999. The offering price had been set at $20, but investors in that frenzied era were so eager for eToys shares that the stock immediately shot up to $78. It ended its first day of trading at $77 a share.

The eToys initial public offering raised $164 million, a nice chunk of change for a two-year-old company. But it wasn't even close to the $600 million-plus the company could have raised if the offering price had more realistically reflected the intense demand for eToys shares. The firm that underwrote the I.P.O. — and effectively set the $20 price — was Goldman Sachs.

After the Internet bubble burst — and eToys, starved for cash, went out of business — lawyers representing eToys' creditors' committee sued Goldman Sachs over that I.P.O. That lawsuit, believe it or not, is still going on. Indeed, it has taken on an importance that transcends the rise and fall of one small company during the first Internet craze.

The plaintiffs charge that Goldman Sachs had a fiduciary duty to maximize eToys' take from the I.P.O. Instead, Goldman purposely set an artificially low price, so that its real clients, the institutional investors clamoring for the stock, could pocket that first-day run-up. According to the suit, Goldman then demanded that some of those easy profits be kicked back to the firm. Part of their evidence for the calculated underpricing of eToys, according to the plaintiffs' complaint, was that Lawton Fitt, the Goldman executive who headed the underwriting team and was thus best positioned to gauge the market demand, actually made a bet with several of her colleagues that the price would hit $80 at the opening. (Through a Goldman Sachs spokesman, Fitt declined to comment. Goldman denies that it did anything wrong, about which more shortly.)

On some level, this argument — between those who believe companies are routinely sold down the river by their underwriters and those who insist that underwriting requires a complex balancing of the interests of both company and investors — has been going on ever since. Just a couple of years ago when the social media company LinkedIn went public and the stock quickly doubled, I wrote that the company had been scammed by its underwriters, Morgan Stanley and

Bank of America's Merrill Lynch unit. Money that rightly belonged to the company had instead gone to investment clients, I argued. A number of market observers responded by saying that I lacked a nuanced understanding of the complicated dynamics between companies, investors and underwriters.

Recently, however, I came across a cache of documents related to the eToys litigation that seem to tilt the argument in favor of the skeptics. Although the documents were supposed to be under seal, they were sitting in a file at the New York County Clerk's Office, available to anyone who asked for them. I asked.

What they clearly show is that Goldman knew exactly what it was doing when it underpriced the eToys I.P.O. — and many others as well. (According to the lawsuit, Fitt led around a dozen underwritings in 1999, several of which were also woefully underpriced.) Taken in their entirety, the e-mails and internal reports show Goldman took advantage of naïve Internet start-ups to fatten its own bottom line.

Goldman carefully calculated the first-day gains reaped by its investment clients. After compiling the numbers in something it called a trade-up report, the Goldman sales force would call on clients, show them how much they had made from Goldman's I.P.O.'s and demand that they reward Goldman with increased business. It was not unusual for Goldman sales representatives to ask that 30 to 50 percent of the first-day profits be returned to Goldman via commissions, according to depositions given in the case.

"What specifically do you recall" your Goldman broker wanting, asked one of the plaintiffs' lawyers in a deposition with an investor named Andrew Hale Siegal.

"You made $50,000, how about $25,000 back?" came the answer. "You know, you made a killing."

"Did he ever explain to you how to pay it back?" asked the lawyer.

"No. But we both knew that I knew how," Siegal replied. "I mean, commissions, however I could generate."

In one e-mail, a Goldman Sachs executive named David Dechman described hot I.P.O. deals as "a currency." He asked, "How should we allocate between the various Firm businesses to maximize value to GS?"

Robert Steel, who was then co-head of equity sales at Goldman Sachs and is now one of New York Mayor Michael Bloomberg's top deputies, sent an e-mail to one of the firm's biggest clients, Putnam Investments in Boston, in which he wrote bluntly, "It is my view that we should

be rewarded with additional secondary business for offering access to capital market product" — like hot I.P.O.'s.

Did the clients knuckle under?

Are you kidding?

According to data compiled by the plaintiffs, Capstar Holding, an investing client, made a series of pointless trades solely for Goldman's benefit. The lawsuit quotes an investment manager at the firm, Christopher Rule, as saying that 70 percent of his trading activity in May 1999 was done to generate commissions for Goldman, "pursuant to an 'understanding' with his Goldman broker that he needed to generate money for Goldman in order to receive I.P.O.'s."

On Thursday, Goldman Sachs issued a statement that read, in part, "We did not engage in quid pro quos for allocation of hot I.P.O.'s, and none of the decade-old documents distorted by the eToys litigants suggests otherwise." I have posted a [variety of the documents](#) on The Times's Web site, so that readers can decide for themselves what story they really tell.

Goldman supporters also point out that it was hardly the only underwriter to allocate shares of Internet public offerings based on what it would get in return. In the aftermath of the bubble, Goldman wound up paying fines to the Securities and Exchange Commission for I.P.O. excesses. But so did a lot of other firms. None of the government's allegations, by the way, were related to the kind of practices alleged in the eToys lawsuit. As for the litigation itself, Goldman has argued that, contrary to popular belief, underwriters do not have a fiduciary duty to the companies they are underwriting. In recent years, this argument has held sway in the New York court system, although it has yet to be argued before the Court of Appeals.

GOLDMAN also pointed me to an e-mail Lawton Fitt wrote the day before the I.P.O., hoping to prevent firms that "are not long-term investors/aftermarket buyers" from getting too large an allocation. Even so, that e-mail made it clear that the "flippers" who didn't care about eToys were still going to get around 20 percent of the allocation. The e-mail isn't quite the ringing defense that Goldman makes it out to be.

What is undeniably true, of course, is that the documents are old. Some will dismiss them as relics of another era. But I continue to believe that the mind-set created by the I.P.O. madness of the late 1990s never really went away. To this day, an I.P.O. with a big first-day jump is considered a success, even though the company is being short-shrifted. To this day, investors know that they are expected to find ways to reward the firms that allocate them hot I.P.O. shares. The only thing that is truly different today is that few on Wall Street are so foolish as to put such sentiments in an e-mail.

Earlier this week, I tracked down Toby Lenk, the founder and former chief executive of eToys. Back when the S.E.C. was investigating I.P.O. excesses, the government deposed him. During the deposition, he mostly defended Goldman Sachs, even though he had the uneasy feeling that eToys had been taken advantage of.

After the deposition, he recalled, the S.E.C. lawyers began to show him some Goldman Sachs documents. He saw that one big firm after another had been allocated shares — and had immediately flipped them, even though Goldman had promised that its clients would support the stock. "That's when I thought, 'We really got screwed,'" Lenk told me.

Although the experience still angered him, he now has 14 years' worth of perspective. "Look at what has happened since then," he said. "If you think eToys got screwed, what do you think happened to the country?"

"What Wall Street did to us in 1999 pales in comparison to what they did to the country in 2008," he said.

p. 1

From: Walker, George                           Date Sent: 9/17/99 10:58:57 AM
To: Pitt, Lawton W;Cobrinik, Zachariah;
Cc: Cohen, Larry;Dubno, Michael;Clough, Brent;Rubinstein, Stuart (GSAM);
Bcc:
Subject: FW: Ideas for ECM Internet Project
Number of Attachments: 0                       Folder: Inbox
Message Text:
-------------------------------------------------------------------------

fyi

-----Original Message-----
From: Dechman, David
Sent: Friday, September 17, 1999 9:22 AM
To:   Lewis, Jeremy
Cc:   Tortora, Leslie C; Walker, George
Subject:   Ideas for ECM Internet Project

Jeremy,

Thanks for the update on your project to enhance ECM methods of price discovery
and predicting aftermarket performance of IPOs via capturing information from
internet retail.   You asked for comments on the draft note:


The possible solution in the draft note describes a possible e-bracket for ECM
deals composed of various e-brokers who would give us information flow in return
for access to our deals.  There are three issues which might be interesting to
consider:

1. The hot deals are obviously a currency, which can be used to please
institutions, please high net worth individuals, acquire new customers (perhaps
for GS.com), help ECM as per the memo, etc.  How should we allocate between the
various Firm businesses to maximize value to GS?

2. How much "say" do the issuers have?  They have an obvious trade-off between
a big "pop" (great media coverage and morale boost) versus more cash proceeds.
Could we offer a "dial" to issuers and let them (and perhaps their Ad agencies)
decide?

3. For GS.com, EXCLUSIVE access to GS hot deals might be a critical competitive
tool to keep customer acquisition costs low and encourage larger clients to move
to our site from a competitor's.

Hope this is helpful.  Please keep me informed as the work progresses.


David A Dechman
212-902-0146

-------------------------------------------------------------------------

Confidential Treatment
Requested by
Goldman Sachs Group

GS 147296

Proposed to be Sealed

p. 6

Importance: High

> Please be aware of the following website located on the "Equities --
> Institutional Sales" web page -- it's called the "Underwriting History Report"
> and gives you a look at all deals that a particular account has participated in
> during the last two fiscal years -- in addition to providing the "trade up"
> value over particular time frames and two week/one month aftermarket Buys/Sells
> through GS.....

http://nyiupsw01.eq.gs.com/aims/aftermarket/cgi-bin/clientform.cgi

Please contact your respective help desk to gain access....

Jim Stevens
Equity Capital Markets
Goldman, Sachs & Co.
One New York Plaza
30th Floor
New York, NY 10004

Tel: (212) 902-9517
Fax: (212) 346-4060
email: james.stevens@gs.com

This material is for your information only and is not intended to be used by
anyone other than you. This is not an offer or solicitation with respect to the
purchase or sale of any security. Opinions expressed are our present opinions
only. The material is based upon information which we consider reliable, but we
do not represent that such information is accurate or complete, and it should
not be relied upon as such. This information is current and is subject to
change. Any historical price(s) or value(s) is as of the date indicated. We,
or persons involved in the preparation or issuance of this material, may from
time to time, have long or short positions in, buy or sell (on a principal basis
or otherwise), and act as market makers in, the securities or options, or serve
as a director of any companies mentioned herein. In addition, we may have
served as manager or co-manager of a public offering of securities by any such
company within the past three years. Further information on any securities
mentioned in this material may be obtained upon request.

-----Original Message-----
From: Furey, Timothy T
Sent: Tuesday, February 01, 2000 8:08 AM
To:   Fruskes, Robert K; Savini, Marc P; Heidt, Douglas C; Auslander, Benjamin
H; Miller, Rodney; Miller, Jeffrey S (Equities Management ); Bailen, Katherine
J; Stevens, James T; Shah, Aarjav; Colella, Mario
Cc:   Dellaross, Joseph; Schwartz, Eric S; Lewis, Thomas B; Niedermauer, Duncan
L; Taylor, Robert E; Stolz, Raymond S; Ongaro, Ronald M; Jaffee, Richard T;
Bernstein, Stuart H; Kolitch, Jeffrey A
Subject:   Client Onal Leverage Ratio

Confidential Treatment
Requested by
Goldman Sachs Group

GS 193654

Proposed to be Sealed



# Trade-Up Value:
## Deconstructing the Value Exchange in the Underwriting Business

April 25, 2000

Goldman Sachs

Confidential Treatment Requested by Goldman Sachs Groups

GS 034290





## Allocation Determinants

**External Influences**
- Competitors – Deal pricing, deal allocation methodology, aftermarket performance
- Retail and day-trader pricing pressures (Knight/Trimark)
- Dutch auctions

**Investing Clients**
- Managing expectations
- Growth opportunities
- Recognize behavior
- Understand the allocation model

**Internal Influences**
- Understanding value of clients
- Treat trade-up as capital
- Maximize return on capital
- Develop allocation methodology to maximize return on capital

**Issuing Clients**
- Price stabilization versus trade-up
- Establishment of appropriate share holder base
- Pricing preferences
- Primary versus secondary

Deal Allocations

*Initial analyses have focused on "Internal Influences" and our Investing Clients.*

*Keeping focused on our Issuing Clients should remain of primary importance.*

Goldman Sachs

Confidential Treatment Requested by Goldman Sachs Group

GS 034300

## ADDENDUM E:

## INSTITUTIONS THAT "FLIPPED" THEIR ETOYS ALLOCATIONS

| Institution | Allocation | Percent Flipped |
|---|---|---|
| Fidelity | 200,000 | 90.8% |
| AIM Advisors | 100,000 | 52.2% |
| Alliance | 100,000 | 100% |
| American Express | 100,000 | 67.2% |
| Ark Asset | 100,000 | 92.2% |
| Capital Research and Management Co. | 100,000 | 30% |
| Janus Capital | 100,000 | 100% |
| Jennison Associates | 100,000 | 100% |
| JP Morgan Investment Mgmt. | 100,000 | 0% |
| Miller, Anderson & Sherrerd | 100,000 | 0% |
| Moore Capital Mgt. | 100,000 | 0% |
| MS Asset Mgmt. | 100,000 | 83.9% |
| Nicholas Applegate Cap. Mgt. | 100,000 | 0% |
| Oppenheimer Mgt. | 100,100 | 49.05% |
| Pequot Capital | 100,000 | 100% |
| Putnam Investments | 100,000 | 85.6% |
| Total Institutions | 7,760,000 | 45% |

Source: "Flip Report" compiled by the Depositary Trust Corporation ("DTC").

Note 1: The true amount of flipping actually exceeds the amount shown in the Flip Report, because the DTC flip report did not capture all trades. Traders who maintained only DVP (Delivery vs.

p. 60

Payment) accounts with an underwriter but held their prime brokerage accounts at certain other houses, especially Spear Leads & Co., could flip their shares "away" from the underwriter, through another brokerage house, without detection by the DTC. The trading records of Goldman show that within 30 days of the IPO, its brokerage customers had reaped over $100 million in profits by reselling their eToys IPO allocations. If profits earned by selling "away" from Goldman were added in, the total would be far greater.

p. 61

TO: Distribution

FROM: Mino Capossela
Chris Zaback
Shira Rosenberg

DATE: February 7, 2000

RE: Trade Up Analysis



The significant appetite for Internet offerings over the past year, highlighted by offerings such as Cobalt, EToys and Juniper where 1st Tick Trade Up value exceeded $300 million in each offering, has led to an emphasis on deal allocations. The following analysis addresses this issue and attempts to utilize metrics to analyze fiscal 1999 deal allocations and to identify those clients that have been appropriately designated, as well as those over and underserved.

The analysis covers the GS top 150 (EDOC) Institutional accounts. For each of these clients we have calculated the 1st Tick Trade Up Value for fiscal 1999 (for US Shares deals). We have also identified the corresponding Total Revenues, Non-deal Revenues and Cold Deal Purchases for each of these clients, and have applied metrics to each. From this data we were able to compile average ratios for Trade Up to Non-deal Revenues, large buyers of Cold Deals, and evaluate those customers who treated us well in the after markets.

The analysis does not encompass other information which we think would also be of interest such as market share, designations to GS in jump-ball situations or foreign deals. These are items which we know would be of use, but that are not readily accessible at this point in time. We also understand that this information would be useful beyond the top 150 accounts and at a client coverage level. This is a current focus.

We have attached 4 appendices of analysis as follows:

1. Trade Up Value Analysis of US Shares 1999 Deals – Accounts Sorted in Descending Order of Non-Deal Revenues for All Products
   Analysis sorts the top 50 clients by Non-Deal Revenues and the corresponding Trade Up Value, Ratio of Trade Up to Revenues and Purchasers of Cold Deals. Analysis also contains averages for each of these ratios.

2. Trade Up Value – Outliers
   To highlight clients based upon our analyses that were over or underserved – based upon Trade Up ratios relative to Secondary Revenue Generation, participation in Cold Deals and aftermarket participation.

3. Trade Up Value Analysis of US Shares 1999 Deals – Accounts Sorted in Descending Order of 1st Tick Trade Up Value for All Products
   Analysis sorts the top 150 clients by 1st Tick Trade Up Value and the corresponding Revenues, Ratio of Trade Up to Revenues, Cold Deal Purchases and Ratio of Non-Deal Revenues to Total Revenues.

4. Definition of Terms – Trade Up Value Analyses

Confidential Treatment
Requested by
Goldman Sachs Group

GS 187422

p. 62

Confidential Treatment
Requested by
Goldman Sachs Group

Appendix IV

DRAFT

Definition of Terms

| | |
|---|---|
| Top 150 Clients | Top 150 ECOC clients as defined by Total Revenues |
| 1st Tick Trade Up Value | Calculated as (# shares purchased * (1st Tick Price – Offer Price)). There are a number of ways and points in time in which to measure the gift that we provide to our clients in an equity offering. For purposes of this analysis, the purest methodology was |
| Total Revenues | Calculated as Fiscal 1999 Total Gross Credits + GSS Revenues. While measuring our clients business in terms of Total Revenues is critical in evaluating overall client profitability, for purposes of Trade Up, the more relevant measure of a good client vs. |
| Non-Deal Revenues | Calculated as Fiscal 1999 Total Secondary Gross Credits + GSS Revenues. This equation does not include Primary Gross Credits and is a better measure of how good a client actually is. |
| Ratio of Trade Up / Non Deal Revenues | Measures the relative gift from trade up vs. the revenues earned from our clients in the after markets and from GSS. In essence, this ratio demonstrates the incremental benefit that we provide to our clients for each commission or GSS dollar that is direc |
| Cold Deal Purchases | Total purchases (# shares * offer price) of US Shares' cold deals in 1999. For purposes of the analysis, "Cold Deals" were defined as any offering which traded-up less than 5% on 1st Tick. There are, of course, many other ways in which to characterize a d |
| Cold Deals as a % of Total Purchases | Measures the volume of purchases for cold deals relative to total purchases for equity offerings. This is an excellent measure for determining clients that helped us out on hard to sell deals. |
| Non-Deal Revenues /Total Revenues | Measures the percentage of secondary revenues compared to overall revenues – indicating clients' treatment of GS for non-deal transactions. |

GS 034263

p. 64

## SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

125 Broad Street
New York, NY 10004-2498

LOS ANGELES · PALO ALTO · WASHINGTON, D.C.
FRANKFURT · LONDON · PARIS
BEIJING · HONG KONG · TOKYO
MELBOURNE · SYDNEY

January 11, 2013

Via Federal Express

Susan Dautel, Esq.,
 New York State Court of Appeals,
  20 Eagle Street,
   Albany, New York 12207.

Re: EBC I, Inc. v. Goldman Sachs & Co.
(Supreme Court, New York County Index No. 601805/02)

Dear Ms. Dautel:

We represent Defendant-Appellee Goldman, Sachs & Co. in the above-captioned matter. As you requested from my colleague Rudy Kleysteuber, enclosed herewith are additional documents related to the sealing of documents in this matter. The first is a July 24, 2007 Order signed by Honorable Karla Moskowitz, ordering the sealing of documents in this case, many of which are reproduced throughout the Appendix submitted by Plaintiff-Appellant in lieu of a record on appeal. The second is a March 4, 2010 Order signed by Judicial Hearing Officer John Bradley ordering the sealing of documents related to the Under Seal Declaration of Penny Shane in Support of Goldman Sachs' Motion in Limine (found at pages A4891 et seq. of the Appendix).

Please let us know if the Court requires any further information.

Respectfully submitted,

Penny Shane /SAC

Penny Shane